UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TALIYAH TAYLOR,

                         Plaintiff,

        -against-

MICHELLE SMALL, *et al*.,

                         Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/14/2026

No. 22-CV-2762 (NSR)

**OPINION & ORDER**

NELSON S. ROMÁN, United States District Judge:

*Pro se* Plaintiff Taliyah Taylor ("Plaintiff") brings this action pursuant to 42 U.S.C. § 1983

against Defendants Dr. Michelle Small, OBGYN at Bedford Hills Correctional Facility ("BHCF");

Dr. Patrick Prepetit, Physician at BHCF; Dr. John A. McGurty, Health Service Director at BHCF;

Dr. Laura Mieszerski, OBGYN at BHCF; Eileen Russell, Superintendent of BHCF; Aileen

McCarthy, Deputy Superintendent of Health at BHCF; Thomas J. Loughren, former Commissioner

of the New York State Commission of Correction; and Dr. John Morley, former Deputy

Commissioner and Chief Medical Officer of the New York State Department of Corrections and

Community Supervision ("DOCCS") (collectively, "Defendants"), in their individual and official

capacities, alleging violations of the Eighth Amendment arising from the alleged denial of

adequate medical care.[1]

Plaintiff alleges that, beginning in or about February 2020, she suffered from recurring

urinary tract infections ("UTIs") and related conditions, and that Defendants repeatedly denied,

delayed, or interfered with medically necessary treatment, including specialist referrals, diagnostic

---

[1] As a preliminary note, Plaintiff fails to list Dr. McGurty as a defendant in Section IV of the SAC.  (SAC § IV.)
Notwithstanding this deficiency, the Court construes the SAC to assert claims against Dr. McGurty, particularly
because he is listed in the caption and Plaintiff asserts several allegations concerning his conduct throughout the SAC.

testing, and prescribed medications, despite her worsening symptoms.  Plaintiff further alleges that Defendants persisted in ineffective courses of treatment and failed to provide adequate follow-up care, resulting in prolonged pain and additional medical complications.  Pending before the Court is Defendants' Motion to Dismiss the Second Amended Complaint ("SAC") pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6).[2]  (ECF No. 78.)

For the following reasons, Defendants' Motion to Dismiss is GRANTED in its entirety.

**FACTUAL BACKGROUND**

As written, the SAC is difficult to follow.  Plaintiff does not provide a strictly chronological account of the events underlying her alleged constitutional violations.  Instead, the SAC jumps between various dates and events, making it difficult for the Court to construe the allegations in Plaintiff's favor.  There also appears to be some overlap in Plaintiff's allegations.  With that said, the following background is drawn from the SAC, and the Court accepts the allegations as true and draws all reasonable inferences in Plaintiff's favor.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### I.    Plaintiff's Medical Condition and Initial Requests for Treatment

Plaintiff was an incarcerated individual at Bedford Hills Correctional Facility in Bedford Hills, New York.  (SAC at 2.[3])  Beginning sometime in February 2020—a month before the COVID-19 pandemic—Plaintiff began experiencing recurring UTIs.  (*Id*. at 8.)  Plaintiff alleges that she was "prescribed antibiotics for these bacterial infections and repeatedly given the same

---

[2] The Court refers to the parties' motion papers as follows: (1) ECF No. 79 ("Defs.' Mem."); (2) ECF No. 75 ("Pl. Opp."); and (3) ECF No. 80 ("Defs.' Reply").

[3] A review of the SAC reflects inconsistent page numbering throughout the filing.  For instance, Plaintiff begins numbering the pages on the second page of the PDF, but then resets the numbering on the eighth page of the PDF.  As a result, all citations to the SAC refer to the PDF page numbers generated by the Court's ECF system, rather than the page numbers appearing at the bottom of the SAC.

course of treatment with various antibiotics." (*Id*.)  However, Plaintiff contends that none of the antibiotics were effective. (*Id*.)

Plaintiff subsequently visited Dr. Patrick Prepetit, her primary physician at BHCF, on June 8, 2020, during which he recommended that she see a urologist to treat her recurring UTIs. (*Id*. at 8–9.)  Plaintiff alleges, however, that Dr. John Morley, DOCCS' Deputy Commissioner and Chief Medical Officer, denied Dr. Prepetit's request. (*Id*. at 9.)  Plaintiff alleges that Dr. Morley denied this request because of "arbitrary procedures and misadministration." (*Id*.)  A few months later, on September 4, 2020, Dr. Prepetit submitted a second request for Plaintiff to see a urologist. (*Id*.)  Plaintiff likewise alleges that this request was denied, this time by Dr. John McGurty, BHCF's Health Service Director, due to COVID-19. (*Id*.)  Plaintiff alleges that, because she was denied access to a urologist—and despite being prescribed various antibiotics—she continued to suffer severe UTI symptoms. (*Id*. at 10.)

According to Plaintiff, it was not until Dr. Prepetit's third request that she was approved to see a urologist. (*Id*.)  The SAC does not provide a date on which this approval occurred. (*Id*.)  Notwithstanding the approval of the referral, Plaintiff filed a grievance on July 8, 2020, writing that the delay in medical treatment had worsened her health and exacerbated her UTI symptoms. (*Id*.)

## II.    Plaintiff's Diagnostic Testing and Treatment History

Plaintiff saw non-defendant urologist Dr. "Janice" on October 2, 2020, who recommended that she undergo urodynamic testing. (*Id*. at 12.)  Dr. Prepetit shortly thereafter requested that Plaintiff be permitted to receive the recommended testing. (*Id*.)  Plaintiff alleges, however, that Dr. Michelle Small, a BHCF OBGYN, informed her on October 27, 2020, that Dr. Morley had denied this request due to "systematic failure[s]." (*Id*.)  Plaintiff thereafter filed a grievance on

3

November 6, 2020, requesting that she undergo urodynamic testing. (*Id*.) Plaintiff ultimately received the testing on May 23, 2021. (*Id*.) Plaintiff likewise requested pain medication for her bladder from Dr. Prepetit on February 14, 2021, which she received approximately two weeks later. (*Id*. at 17.)

Plaintiff returned to Dr. Janice for a follow-up appointment on June 4, 2021, during which Dr. Janice recommended that Plaintiff undergo "urodiagnostic" testing. (*Id*.) Three weeks later, on June 24, 2021, Plaintiff saw non-defendant Dr. Moorjani-Harish, an infectious disease specialist, who also recommended that Plaintiff undergo catheterization twice a day for four weeks. (*Id*.) Plaintiff expressed concern about being catheterized while having a UTI due to the potential for medical complications, but did not want to forego treatment that could help relieve her pain. (*Id*. at 18.) As a result, Plaintiff wrote to Dr. Prepetit on June 26, 2021, requesting that she instead undergo the "urodiagnostic" testing prescribed by Dr. Janice. (*Id*.) Plaintiff nevertheless began catheterization on June 28, 2021, during which she alleges that unidentified BHCF nurses were unprofessional and inadequately trained. (*Id*.) Plaintiff further alleges that she missed multiple treatments due to a lack of supplies. (*Id*.)

At some point before Plaintiff began her catheterization treatment, Plaintiff wrote to Dr. Small on May 23, 2021, seeking outside medical treatment due to a fibroid in her uterus and a cyst on her kidney. (*Id*. at 13, 15.) Plaintiff saw Dr. Small on June 24, 2021, at which time Dr. Small prescribed no medication. (*Id*. at 13.) Plaintiff contends that Dr. Small also denied her request for an MRI and other related examinations for her persistent UTIs. (*Id*.) Although unclear from the SAC, Plaintiff contends that Dr. Small denied Plaintiff's request partially because Plaintiff had already been prescribed antibiotics, probiotics, and vitamins by Drs. Small, Prepetit, and Janice. (*Id*. at 14.) According to Plaintiff, those prescriptions were ineffective, and her requested

medications and treatments would have shrunk the cysts and cured her UTIs. (*Id*.) At one point, however, Plaintiff alleges that she received her requested treatments, although the SAC does not include the relevant dates. (*Id*.) After receiving her requested treatments, Plaintiff alleges that she tested positive for herpes simplex and that her vitamin D levels were abnormally low. (*Id*.) Following these diagnoses, Plaintiff filed a grievance on June 24, 2021, requesting to see a nephrologist—a medical doctor specializing in kidney care. (*Id*. at 15.) Approximately three months later, on October 5, 2021, Plaintiff was eventually permitted to visit a nephrologist. (*Id*.) However, due to the delay, Plaintiff alleges that she developed an ovarian cyst and an enlarged uterus. (*Id*.)

Plaintiff similarly had a follow-up appointment with Dr. Moorjani-Harish on July 29, 2021, during which she was recommended to be prescribed Turmeric and Biopeperine to help boost her immune system. (*Id*. at 21.) While Plaintiff received this medication on September 9, 2021, she contends it was missing critical ingredients, including black pepper, which is used to increase the absorption of nutrients and supplements. (*Id*. at 22.) Plaintiff complained to Dr. Prepetit, as well as Dr. McGurty and Aileen McCarthy, BHCF's Deputy Superintendent. (*Id*.) Although unclear from the SAC, it also appears that Plaintiff possibly was not prescribed Biopeperine. (*Id*.) According to Plaintiff, Dr. McGurty prescribed only Turmeric because he believed "it had both medications in one pill," which Plaintiff contends was inaccurate. (*Id*.) Plaintiff likewise alleges that Dr. Moorjani-Harish, during the July 29, 2021 appointment, also recommended that Plaintiff receive a CT scan, which was not performed until November 23, 2021. (*Id*.) Before receiving her CT scan, Plaintiff wrote to Deputy Superintendent McCarthy on August 17, 2021, inquiring why she had not received an MRI or CT scan. (*Id*. at 19.) As a result of being prescribed defective medication, coupled with delayed treatment, Plaintiff filed another grievance on September 29,

2021, asserting that various BHCF personnel and officials were deliberately interfering with her medical treatment. (*Id*. at 23.)

Prior to filing her September 29, 2021 grievance, on August 10, 2021, Plaintiff was finally permitted to undergo "urodiagnostic" testing. (*Id*. at 18.) On August 17, 2021, Plaintiff nevertheless alleges that the BHCF pharmacy prescribed her an incorrect dosage of her UTI medication, an error that was not corrected until September 16, 2021. (*Id*.) Plaintiff further alleges that she filed a grievance on December 9, 2021, asserting that the BHCF pharmacy continued to provide her with incorrect dosages of her medication. (*Id*.) On August 23, 2021, Plaintiff also wrote to Dr. Laura Mieszerski, a BHCF OBGYN, seeking an appointment due to vaginal pain. (*Id*.) Three weeks later, Plaintiff attended an appointment with Dr. Mieszerski and received appropriate medication. (*Id*.)

The SAC alleges further instances of deliberate indifference and inadequate medical care occurring in 2022. (*See, e.g.*, *id*. at 10–11, 13, 17, 19–21.) However, as explained in more detail below, the Court need not address these factual allegations because Plaintiff has not administratively exhausted these claims.

### III.    Allegations of Inadequate Medical Care

Plaintiff's claims center on allegations that Defendants repeatedly denied, delayed, or otherwise interfered with medically necessary treatment for her chronic and worsening UTIs. (SAC at 4.) In particular, Plaintiff alleges that Defendants—including Drs. Morley and McGurty—rejected multiple requests by her treating physician, Dr. Prepetit, to refer her to a urologist and to approve specialist-recommended diagnostic testing, despite her continued complaints of severe pain and persistent infections. (*Id*. at 9–11.) Plaintiff further alleges that, even after outside specialists recommended specific testing and treatment, Defendants failed to

timely authorize such care, resulting in months-long delays before she ultimately underwent certain diagnostic procedures. (*See, e.g.*, *id*. at 12.) According to Plaintiff, these delays prolonged her suffering and caused her condition to worsen. (*See, e.g.*, *id*. at 10–11, 17–18.)

Plaintiff additionally alleges that Defendants continued prescribing ineffective treatment—primarily antibiotics and vitamins—even after those measures allegedly failed to alleviate her condition. (*Id*. at 10, 14.) She also claims that Defendants interfered with prescribed care by denying or modifying recommended medications, providing incorrect dosages, and failing to provide necessary components of prescribed treatment. (*Id*. at 19, 22.) Plaintiff further points to delayed follow-up care, including postponed appointments, delayed diagnostic testing, and extended waits for specialist consultations. (*See generally id*.) In sum, Plaintiff contends that Defendants engaged in a pattern of delayed and inadequate medical care that resulted in prolonged pain, worsening medical conditions, and additional complications.

## PROCEDURAL HISTORY

Plaintiff commenced this action on April 4, 2022. (ECF No. 2.) Plaintiff subsequently filed the First Amended Complaint on November 4, 2022. (ECF No. 25.) On April 11, 2024, the Court dismissed the First Amended Complaint in its entirety and granted Plaintiff leave to file the SAC. (ECF No. 50.) After the Court granted several extensions, (ECF Nos. 52, 55), Plaintiff filed the Second Amended Complaint.[4] (ECF No. 56.) Defendants moved to dismiss the SAC on June 25, 2024. (ECF No. 59.) The Court waived the pre-motion conference and set a briefing schedule. (ECF No. 64.) However, due to Plaintiff's medical conditions, the Court vacated the briefing schedule and stayed the instant action. (ECF No. 72.) On October 22, 2025, Plaintiff informed the Court that she was ready to proceed, (ECF No. 73), and the Court thereby set an amended

---

[4] The docket reflects that the SAC was filed twice—once on June 11, 2024, and again on June 21, 2024. (ECF Nos. 56, 58.) A review of both filings, however, demonstrates that they are identical.

briefing schedule.  (ECF No. 74.)  Defendants filed their opening papers on November 24, 2025.

(ECF Nos. 78–79.)  The Court received Plaintiff's opposition papers on January 5, 2026.  (ECF

No. 75.)  Defendants filed their reply papers in further support of their Motion on January 29,

2026.  (ECF No. 80.)

**LEGAL STANDARD**

**I.      Federal Rule of Civil Procedure 12(b)(1)**

Under Federal Rule of Civil Procedure 12(b)(1), "[a] case is properly dismissed for lack of

subject matter jurisdiction . . . when the district court lacks the statutory or constitutional power to

adjudicate it."  *Nike, Inc. v. Already, LLC*, 663 F.3d 89, 94 (2d Cir. 2011) (citation and internal

quotations omitted).  "A plaintiff asserting subject matter jurisdiction has the burden of proving by

a preponderance of the evidence that it exists."  *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d

167, 170 (2d Cir. 2008) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)).  In

assessing whether there is subject matter jurisdiction, the district court must accept as true all

material facts alleged in the complaint.  *Conyers v. Rossides*, 558 F.3d 137, 143 (2d Cir. 2009).

Without jurisdiction, the district court is devoid of the "power to adjudicate the merits of the case,"

and therefore must decide a motion under Federal Rule of Civil Procedure 12(b)(1) before

addressing any motion on the merits.  *Carter v. HealthPort Tech., LLC*, 822 F.3d 47, 55 (2d Cir.

2016).

**II.     Federal Rule of Civil Procedure 12(b)(6)**

Under Federal Rule of Civil Procedure 12(b)(6), dismissal is proper unless the complaint

"contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on

its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

When there are well-pled factual allegations in the complaint, "a court should assume their veracity

8

and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679.  While the district court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, it is "not bound to accept as true a legal conclusion couched as a factual allegation," or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555).

The Second Circuit "deem[s] a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference . . . and documents that plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rotham v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (internal citations omitted).  The critical inquiry is whether a plaintiff has pled sufficient facts to nudge their claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.  A motion to dismiss will be denied where the allegations "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Where a *pro se* plaintiff is concerned, district courts must construe the pleadings in a particularly liberal fashion. *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009).  In fact, district courts must interpret the *pro se* plaintiff's pleading "to raise the strongest arguments that [it] suggest[s]." *Harris v. City of New York*, 607 F.3d 18, 24 (2d Cir. 2010) (internal quotations and citation omitted).  Nevertheless, a *pro se* plaintiff's pleadings must contain factual allegations that sufficiently "raise a right to relief above the speculative level," *Jackson v. N.Y.S. Dep't of Labor*, 709 F. Supp. 2d 218, 224 (S.D.N.Y. 2010), and the district court's duty to construe the complaint liberally is not "the equivalent of a duty to re-write it," *Geldzahler v. N.Y. Med. College*, 663 F. Supp. 2d 379, 387 (S.D.N.Y. 2009).

III.    **Section 1983 Claims**

"Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citing *City of Okla. City v. Tuttle*, 471 U.S. 808, 816 (1985)). "To state a claim under Section 1983, a plaintiff must allege facts indicating that some official action has caused the plaintiff to be deprived of his or her constitutional rights." *Zherka v. Amicone*, 634 F.3d 642, 644 (2d Cir. 2011) (citing *Colombo v. O'Connell*, 310 F.3d 115, 117 (2d Cir. 2002) (per curiam)); *see also Ross v. Westchester Cnty. Jail*, 2012 WL 86467, at \*9 (S.D.N.Y. Jan. 11, 2012). A defendant's conduct must therefore be a proximate cause of the claimed violation in order to find that the individual defendant deprived the plaintiff of his constitutional rights. *Ross*, 2012 WL 86467, at \*9 (citing *Martinez v. California*, 444 U.S. 277, 285 (1980)). Additionally, a plaintiff seeking monetary damages against the defendant must show personal involvement on the part of the defendant in the alleged constitutional deprivation as a prerequisite to recovery under § 1983. *Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010) (citing *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006)).

## DISCUSSION

Defendants move to dismiss the SAC on several grounds. First, Defendants argue that certain Defendants lack the requisite personal involvement to sustain liability under § 1983. (Defs.' Mem. at 4.) Second, Defendants contend that Plaintiff fails to state a claim for deliberate indifference under the Eighth Amendment. (*Id*. at 5.) Third, Defendants assert that Plaintiff's claims for damages against Defendants in their official capacities are barred by the Eleventh Amendment. (*Id*. at 7.) Fourth, Defendants argue that any state law claims are barred by New York Correction Law § 24. (*Id*.) Fifth, Defendants contend that Plaintiff's claims for injunctive relief are moot because she no longer resides at BHCF. (*Id*.) Sixth, Defendants assert that they

are entitled to qualified immunity. (*Id*. at 8.)  Finally, Defendants argue that Plaintiff failed to administratively exhaust claims arising after the commencement of this action. (*Id*. at 9.) The Court addresses each argument in turn.

## I.   Threshold Matters

### A. Mootness of Injunctive Relief Claims

At the outset, the Court must determine whether Plaintiff's claims for injunctive relief are moot given that she is no longer a resident of BHCF. Plaintiff specifically seeks several different forms of injunctive relief concerning the provision of adequate medical care. (SAC at 30–31.) In turn, Defendants argue that because Plaintiff has been transferred to a different DOCCS facility, her requested injunctive relief is now moot. (Defs.' Mem. at 7–8.)  The Court agrees.

It is well settled in the Second Circuit that "[a]n inmate's transfer from a prison facility moots [her] claims for declaratory or injunctive relief against officials of the transferring facility." *McCray v. Lee*, 963 F.3d 110, 117 (2d Cir. 2020); *see also Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006), *overruled in part on other grounds by Kravitz v. Purcell*, 87 F.4th 111 (2d Cir. 2023); *Prins v. Coughlin*, 76 F.3d 504, 506 (2d Cir. 1996) (per curiam); *Young v. Coughlin*, 866 F.2d 567, 568 n.1 (2d Cir. 1989); *Mawhinney v. Henderson*, 542 F.2d 1, 2 (2d Cir. 1976).

Applying this principle, on September 18, 2025, Plaintiff informed the Court that she had been transferred to a different DOCCS facility in Bedford Hills, New York. (ECF No. 65.) Plaintiff's opposition clarifies that she is now housed at Taconic Correctional Facility. (Pl. Opp. at 13.)  In arguing that her injunctive claims are not moot, Plaintiff relies on *Diaz v. Kopp*, where the Second Circuit held that a *habeas corpus* petition was not moot despite the petitioner's transfer to a different DOCCS facility. (*Id*. (citing 146 F.4th 301, 304 (2d Cir. 2025).)  Plaintiff is correct that the *Diaz* court held the petitioner's injunctive relief claims were not moot despite his transfer

11

to another facility.  Plaintiff, however, is incorrect to the extent she analogizes *Diaz* to this action. The petitioner in *Diaz* sought injunctive relief narrowed to a single claim—release from DOCCS custody.  *Diaz*, 146 F.4th at 304.  That is not the case here, as Plaintiff seeks several different forms of injunctive relief based on available medical treatment at BHCF—which is no longer where she resides.  (SAC at 30–31; Pl. Opp. at 13.)  Because Plaintiff is presently incarcerated at a different DOCCS facility than BHCF, her claims for injunctive relief—which primarily seeks to reform medical care procedures at BHCF—must be denied as moot.  *See Booker v. Graham*, 974 F.3d 101, 107 (2d Cir. 2020) ("In this circuit, an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility."); *Arriaga v. Annucci*, 2024 WL 1743300, at *14 (S.D.N.Y. Apr. 23, 2024) ("a prisoner's transfer from a correctional facility generally moots claims for declaratory and injunctive relief against officials of that facility."); *Rodriguez v. Palmer*, 2023 WL 8603124, at *1 n.2 (S.D.N.Y. Dec. 12, 2023) ("Plaintiff was subsequently transferred to a different facility, and the Parties agree those claims for relief are now moot.").

## B.  Eleventh Amendment and Official Capacity Claims

The Court must next consider whether Plaintiff's official capacity claims for compensatory and punitive damages are barred by the Eleventh Amendment.  Defendants argue that such claims must be dismissed in light of sovereign immunity.  (Defs.' Mem. at 7.)  The Court agrees.

Absent abrogation by Congress, a state is immune from suit in federal court.  *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54–56 (1996); *see also Dube v. State Univ. of New York*, 900 F.2d 587, 594 (2d Cir. 1990).  This immunity extends to "arms of the state," which includes "officers employed by agencies such as DOCCS."  *See Peck v. Annucci*, 2025 WL 3022454, at *7 (S.D.N.Y. Oct. 29, 2025) (dismissing § 1983 claims seeking monetary damages against DOCCS

12

personnel in their official capacities under the Eleventh Amendment); *Williams v. Annucci*, 2018 WL 3148362, at \*10 (S.D.N.Y. June 27, 2018) (dismissing § 1983 claims seeking monetary damages against DOCCS personnel in their official capacity because they "cannot stand" in light of sovereign immunity); *Matteo v. Perez*, 2017 WL 4217142, at \*7 (S.D.N.Y. Sept. 19, 2017) (dismissing § 1983 claims against DOCCS official because of Eleventh Amendment).  In other words, "[t]he immunity recognized by the Eleventh Amendment extends beyond the states themselves to state agents . . . that are, effectively, arms of a state." *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009); *see also Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (a suit against a state official in their official capacity is "not a suit against the official but rather is a suit against the official's office").

In the context of § 1983, claims against state officers in their official capacities must be dismissed because such officials are not considered "person[s]" within the meaning of the statute. *See Reynolds v. Barrett*, 685 F.3d 193, 204 (2d Cir. 2012); *see also Koehl v. Dalsheim*, 85 F.3d 86, 88–89 (2d Cir. 1996) (affirming dismissal of § 1983 claims against DOCCS superintendent in official capacity).  A limited exception exists, however.  State officials may be sued in their official capacities where the "complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *See Virginia Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 254–56 (2011) (citing *Verizon Md. Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002); *Ex parte Young*, 209 U.S. 123 (1908)); *see also Mary Jo C. v. N.Y. State & Local Ret. Sys.*, 707 F.3d 144, 152 (2d Cir. 2013), *cert. dismissed*, 569 U.S. 1040 (2013); *KM Enterprises, Inc. v. McDonald*, 518 Fed. Appx. 12, 13 (2d Cir. 2013).  This exception does not apply when a plaintiff seeks money damages. *See Exxon Mobil Corp. v. Healey*, 28 F.4th 383, 392 (2d Cir. 2022) ("[T]he

13

Eleventh Amendment bars the award of money damages against state officials in their official capacities.")

Plaintiff seeks both compensatory and punitive damages based on Defendants' alleged deliberate indifference to her medical needs. (SAC at 30–31.) However, Defendants, at least during the relevant period of this action, were employed by BHCF and DOCCS, (*see id*. at 3), and are therefore "effectively, arms of [the] state." *Gollomp*, 568 F.3d at 366. Plaintiff is consequently barred from pursuing damages against them in their official capacities. *See Pineda v. Doe 1-2*, 2025 WL 2145661, at *3 (S.D.N.Y. July 29, 2025) ("The Eleventh Amendment therefore precludes Plaintiff's claims for damages under Section 1983 against the individual defendants, in their official capacities, as officers of the State of New York."). As explained above, "New York has not waived its Eleventh Amendment immunity to suit in federal court, and Congress did not abrogate the states' immunity in enacting Section 1983." *Javier v. Russo*, 2021 WL 4252061, at *5 (S.D.N.Y. Sept. 17, 2021) (citing *Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 40 (2d Cir. 1977)); *see also Mamot v. Bd. of Regents*, 367 F. App'x. 191, 192 (2d Cir. 2010) ("It is well-established that New York has not consented to § 1983 suits in federal court, and that § 1983 was not intended to override a state's sovereign immunity."). Nor does Plaintiff benefit from the exception for prospective injunctive relief, as those claims have been dismissed as moot. Claims against Defendants in their official capacities are therefore dismissed.

### C. Administrative Exhaustion

The Court next considers whether Plaintiff failed to exhaust her administrative remedies with respect to claims arising after she commenced this action. Defendants specifically argue that Plaintiff failed to exhaust all available administrative remedies before initiating the instant action as to allegations arising after April 4, 2022. (Defs.' Mem. at 9.) The Court agrees.

14

The Prison Litigation Reform Act (the "PLRA") prohibits incarcerated individuals from bringing an action under § 1983 "until such administrative remedies as are available are exhausted." *Smith v. Cordero*, 2024 WL 2802860, at *2 (S.D.N.Y. May 28, 2024) (citing 42 U.S.C. § 1997e(a)).  When an incarcerated individual is in DOCCS custody, the relevant administrative remedy is the Inmate Grievance Program ("IGP").  *See Garcia v. Heath*, 74 F.4th 44, 46 (2d Cir. 2023) (citing 7 N.Y.C.R.R. § 701.5).  The IGP employs a three-step process that incarcerated individuals must follow when submitting grievances: (1) filing an initial complaint to be reviewed by the IGRC; (2) appealing any adverse IGRC determination to the facility superintendent; and (3) appealing any adverse superintendent determination to Central Office Review Committee.  *Id*. (citing 7 N.Y.C.R.R. §§ 701.1(c), 701.5).  When an incarcerated individual "does not properly exhaust [her] administrative remedies before filing suit, the action must be dismissed."  *Terry v. Hulse*, 2018 WL 4682784, at *7 (S.D.N.Y. Sept. 28, 2018) (quoting *Mateo v. Alexander*, 2010 WL 431718, at *3 (S.D.N.Y. Feb. 9, 2010)).  Indeed, the PLRA's exhaustion requirement is "mandatory" and thus "foreclose[es] judicial discretion."  *Ross v. Blake*, 578 U.S. 632, 639 (2016). However, because failure to exhaust is an affirmative defense, "defendants bear the initial burden of establishing, by pointing to legally sufficient sources such as statutes, regulations, or grievance procedures, that a grievance process exists and applies to the underlying dispute."  *Hubbs v. Suffolk Cty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) (cleaned up).

Plaintiff commenced this action on April 4, 2022.  (ECF No. 2.)  The SAC nonetheless includes several allegations arising after this date.  For instance, Plaintiff alleges that Dr. Prepetit's request to prescribe D-Mannose was denied on June 20, 2022; that she wrote several follow-up letters to Dr. McGurty in August 2022 seeking to see Dr. Janice; that her requests for various forms of treatment were denied on September 22, 2022; and that she questioned lab results performed by

Dr. Mieszerski on July 13, 2022.  (SAC at 10, 13, 17, 21.)  In response, Plaintiff unfortunately misconstrues administrative exhaustion with the statute of limitations, arguing that the "continuing violation doctrine" permits her to pursue claims arising after this action's initiation.  (Pl. Opp. at 7.)  Defendants' argument, however, does not concern whether Plaintiff's allegations are time-barred, but rather whether Plaintiff exhausted those claims before raising them in federal court. Because Plaintiff initiated this action on April 4, 2022, (ECF No. 2), it would have been impossible for her to have exhausted her administrative remedies with respect to claims arising after that date before commencing this action.  Nor can Plaintiff cure this deficiency merely because the SAC details instances of her filing grievances post-initiation. (*See, e.g.*, SAC at 10 (filing grievance on July 20, 2022).)  Complete exhaustion must be accomplished "prior to commencing suit," as it is insufficient to "take only limited steps toward exhaustion before commencing suit, or even to exhaust a claim entirely during the pendency of the case." *Rodriguez v. Burnett*, 2026 WL 673053, at *5 (S.D.N.Y. Mar. 10, 2026) (citation omitted); *see also Neal v. Goord*, 267 F.3d 116, 122–23 (2d Cir. 2001) (holding that administrative remedies must be exhausted prior to filing the initial complaint and that exhaustion during the pendency of the federal suit is insufficient), *overruled on other grounds by Porter v. Nussle*, 534 U.S. 516 (2002).  Plaintiff's post-April 4, 2022 allegations therefore must be dismissed for failure to exhaust administrative remedies prior to commencing this action.

### D.  Potential State Law Claims

While the SAC appears to assert only an Eighth Amendment claim against Defendants, the Court, in an abundance of caution, considers whether Plaintiff may also be attempting to assert state law claims.  Defendants argue that, to the extent Plaintiff seeks to raise state law claims, those claims are barred by New York Correction Law § 24.  (Defs.' Mem. at 7.)  The Court agrees.

New York Correction Law § 24 requires that claims against DOCCS personnel "arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties" be brought in the New York Court of Claims. *Olutosin v. Lee*, 2016 WL 2899275, at *12 (S.D.N.Y. May 16, 2016) (citing N.Y. Correct. Law § 24). "The Second Circuit has held that [New York Correction Law § 24] prevents federal courts from exercising pendent jurisdiction over state law claims appended to federal claims brought pursuant to 42 U.S.C. § 1983." *Sughrim v. New York*, 2020 WL 7047697, at *21 (S.D.N.Y. Nov. 30, 2020) (quoting *Hassell v. Fischer*, 96 F. Supp. 3d 370, 385 (S.D.N.Y. 2015)); *see also Brown v. Griffin*, 2019 WL 4688641, at *8 (S.D.N.Y. Sept. 25, 2019) (same); *Davis v. McCready*, 283 F. Supp. 3d 108, 124 (S.D.N.Y. 2017) (same); *Cruz v. New York*, 24 F. Supp. 3d 299, 309 (W.D.N.Y. 2014) (same).

Plaintiff does not allege that Defendants acted outside the scope of their employment with BHCF or DOCCS. (*See generally* SAC); *see also* Cruz, 24 F. Supp. 3d at 310 (explaining that "[t]he test to determine whether the defendants' actions fall within the scope of their employment is whether the defendants' actions fall within the scope of their employment is whether the act was done while the servant was doing his master's work no matter how irregularly, or with what disregard of instructions"). The Court therefore dismisses any potential state law claims without prejudice, so that Plaintiff may refile them in the appropriate state court.

### E.  Lack of Personal Involvement

The Court next considers whether certain Defendants have the requisite personal involvement to sustain liability under § 1983. Specifically, Defendants argue that Plaintiff fails to plausibly allege that Defendants Commissioner Loughren, Superintendent Russell, Deputy Superintendent McCarthy, Dr. Morley, Dr. Prepetit, and Dr. Mieszerski were personally involved in her medical treatment. (Defs.' Mem. at 4–5.) In response, Plaintiff contends that each

Defendant was personally involved in the alleged constitutional violations because they were aware of her medical condition through grievances and treatment records, yet failed to intervene, denied or delayed care, or otherwise permitted an ineffective course of treatment to continue. (Pl. Opp. at 3–5.)  However, as the Court previously held, *see Taylor v. Small*, 2024 WL 1605066, at *5 (S.D.N.Y. Apr. 11, 2024), the SAC still fails to plausibly allege the personal involvement of the above-referenced Defendants, with the exception of Dr. Morley.

It is well settled that "a defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority."  *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996); *see also Corbett v. Annucci*, 2018 WL 919832, at *6 (S.D.N.Y. Feb. 13, 2018) (same).  To the contrary, "a plaintiff must establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his individual capacity."  *Warren v. Pataki*, 823 F.3d 125, 136 (2d Cir. 2016) (quoting *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 229 (2d Cir. 2004)).  In the context of supervisory liability, the Second Circuit has explained that "there is no special rule for supervisory liability.  Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'"  *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676).

In this case, to state an Eighth Amendment claim for inadequate medical care, a plaintiff must demonstrate (1) an objectively serious medical need, which "exists where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain,'" and (2) a defendant's subjective "deliberate indifference," that is, whether the prison official acted with a sufficiently culpable state of mind.  *Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000).  Deliberate indifference in this context "means the official must 'know[ ] of

and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Tangreti*, 983 F.3d at 619 (citing *Vega v. Semple*, 963 F.3d 259, 273 (2d Cir. 2020)).  Plaintiff must therefore establish that Defendants Commissioner Loughren, Superintendent Russell, Deputy Superintendent McCarthy, Dr. Morley, Dr. Prepetit, and Dr. Mieszerski violated the Eighth Amendment through their own conduct.

Beginning with Commissioner Loughren, Plaintiff contends that he cultivated an unconstitutional culture at BHCF because he was aware that other Defendants were not effectively treating her recurring UTIs.  (Pl. Opp. at 3.)  Plaintiff further contends that Commissioner Loughren was aware of these medical deficiencies because she wrote to him requesting that he intervene and remedy the alleged Eighth Amendment violations.  (SAC at 27.)

As a preliminary matter, Plaintiff cannot maintain a § 1983 claim based solely on Commissioner Loughren's high-ranking position within the Commission of Correction.  *See Illescas v. Annucci*, 2022 WL 17539696, at *5 (S.D.N.Y. Dec. 7, 2022) (citing *Black*, 76 F.3d at 74); *see also Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (holding that DOCCS Commissioner was not personally involved simply because Plaintiff wrote to him).  Nevertheless, as the Court previously held, Commissioner Loughren was in charge of the Commission of Correction—not DOCCS—which is simply a "'State Watchdog' agency . . . [s]o even had [Commissioner Loughren] accepted [Plaintiff's] grievance, there likely would have been no benefit to [P]laintiff." *Taylor*, 2024 WL 1605066, at *4 (S.D.N.Y. Apr. 11, 2024) (quoting *Jones v. Sheriff of Suffolk Cnty.*, 2020 WL 4287011, at *2 (E.D.N.Y. July 27, 2020)).  Commissioner Loughren had "no hiring, firing, or disciplinary power over any supervisory staff or personnel of the [DOCCS] correctional facilities," nor did he have "direct power to control or direct the customs and policies of the

19

facilities." *Brody v. McMahon*, 684 F. Supp. 354, 356 (N.D.N.Y.), *aff'd*, 862 F.2d 304 (2d Cir. 1988); *see also Banks v. Annucci*, 48 F. Supp. 3d 394, 414 (N.D.N.Y. 2014) ("[M]embers of the Commission [of Correction] are not endowed with any operational or supervisory responsibilities of the . . . [DOCCS Facilit[ies] . . . and thus have no power to control the internal policies or procedures of each institution."). Nor can Plaintiff assert that Commissioner Loughren was personally involved in her medical treatment merely because she wrote him a letter detailing the alleged medical deficiencies at BHCF. *See Bonie v. Annucci*, 2023 WL 2711349, at *6 (S.D.N.Y. Mar. 30, 2023) (DOCCS Commissioner's "receipt of letters or grievances, by itself, does not amount to personal involvement"); *Sierra v. Doe 22*, 2024 WL 866866, at *4 (N.D.N.Y. Jan. 26, 2024) ("Defendant['s] alleged receipt of letters from Plaintiff's family members is insufficient to demonstrate Defendant['s] personal involvement in the alleged violation of Plaintiff's rights."), *report and recommendation adopted sub nom. Sierra v. Zerniak*, 2024 WL 865866 (N.D.N.Y. Feb. 28, 2024); *Mateo v. Fischer*, 682 F. Supp. 2d 423, 430 (S.D.N.Y. Feb. 8, 2010) ("[T]he receipt of letters or grievances, by itself, does not amount to personal involvement."). Plaintiff has not plausibly alleged Commissioner Loughren's personal involvement in the alleged constitutional violations.

Plaintiff's claims against BHCF Superintendent Russell likewise fail. Plaintiff alleges that each time she filed a grievance appeal seeking medical attention, Defendant Russell denied her request. (SAC at 25–26.) But such an allegation is insufficient to sustain liability under § 1983. The Court again reiterates its prior holding that the denial of grievances, without more, is insufficient to establish personal involvement under § 1983. *See Taylor*, 2024 WL 1605066, at *5; *see also McIntosh v. United States*, 2016 WL 1274585, at 16 (S.D.N.Y. Mar. 31, 2016) ("[M]ere receipt of a complaint or grievance from an inmate is insufficient to establish personal

involvement."); *Pagan v. Corr. Med. Servs.*, 2012 WL 2036041, at 6 (S.D.N.Y. June 6, 2012) ("Courts in this district have repeatedly held that 'affirming the administrative denial of a prison inmate's grievance by a high-level official is insufficient to establish personal involvement under section 1983.'"); *Foreman v. Goord*, 2004 WL 1886928, at *7 (S.D.N.Y. Aug. 23, 2004) ("The fact that [a prison superintendent] affirmed the denial of plaintiff's grievances is insufficient to establish personal involvement."). If district courts found personal involvement every time a superintendent of a DOCCS facility affirmed a grievance denial, the requirement would lose all meaning. *See Thompson v. New York*, 2001 WL 636432, at *7 (S.D.N.Y. Mar. 15, 2001) (finding that defendant was not personally involved in a constitutional violation by denying a grievance and noting that "virtually every prison inmate who sues for constitutional [violations] . . . could name the Superintendent as a defendant since the plaintiff must pursue his prison remedies and invariably the plaintiff's grievance will have been passed upon by the Superintendent."); *see also Amaker v. Goord*, 2002 WL 523371, at 16 (S.D.N.Y. Mar. 29, 2002) ("[DOCCS official] testified that he receives thousands of letters each year, . . . and that his office generally forwarded the letters to the appropriate personnel to handle the problems in question."). Personal involvement requires more than the mere receipt or denial of grievances.

For similar reasons, Plaintiff's claims against Deputy Superintendent McCarthy fail. Plaintiff alleges that she (1) wrote to Defendant McCarthy inquiring why she had not received an MRI and CT scan, in addition to being denied access to a specialist, and (2) complained to Defendant McCarthy about receiving defective medication. (SAC at 19, 22–23.) But such allegations are again insufficient to plausibly allege personal involvement in the context of § 1983 because "[a] supervisory official's receipt of a letter complaining about unconstitutional conduct is not enough to give rise to personal involvement on the part of the official." *Taylor*, 2024 WL

21

1605066, at *5 (citing *Brooks v. Chappius*, 450 F. Supp. 2d 220, 225–26 (W.D.N.Y. 2006)).  Courts in this Circuit agree with this principle.  *See, e.g.*, *Thomas v. Morley*, 2022 WL 394384, at *6 (S.D.N.Y. Feb. 9, 2022) (finding no personal involvement where defendants allegedly received grievances and complaints); *Sealey*, 116 F.3d at 51 (same); *Bonie*, 2023 WL 2711349, at *6 (same); *Illescas*, 2022 WL 17539696, at *5 (same).  Plaintiff has not plausibly alleged Deputy Superintendent McCarthy's personal involvement in the alleged constitutional violations.

Turning to Plaintiff's claims against Drs. Prepetit and Mieszerski, the SAC is devoid of allegations demonstrating how either defendant personally violated Plaintiff's Eighth Amendment rights.  Plaintiff's allegation that Dr. Prepetit failed to prescribe effective medication to treat her recurring UTIs, (SAC at 15), is contradicted by her own pleadings.  To the contrary, the SAC details that Dr. Prepetit examined Plaintiff on multiple occasions, recommended that Plaintiff be seen by a urologist on three separate occasions, prescribed specific medications beyond antibiotics to treat Plaintiff's UTIs, including D-Mannose, and requested that Plaintiff be seen by an infectious disease specialist.  (*Id*. at 9–11, 17.)  The same is true for Dr. Mieszerski, who examined Plaintiff and provided appropriate medication.  (*Id*. at 12.)  Neither Drs. Prepetit nor Mieszerski exhibited deliberate indifference to Plaintiff where the SAC itself demonstrates that they repeatedly examined Plaintiff, prescribed medication, and sought additional treatment for her recurring medical issues.  *See Griffin v. Capra*, 2021 WL 1226428, at *7 (S.D.N.Y. Mar. 31, 2021) (dismissing deliberate indifference claims where plaintiff was prescribed several different antibiotics for recurring medical issues); *Perkins v. Perez*, 2019 WL 1244495, at *11 (S.D.N.Y. Mar. 18, 2019) (dismissing a deliberate indifference claim where plaintiff's medical needs were addressed by examination by a doctor and prescription of pain medication); *Melvin v. County of Westchester*, 2016 WL 1254394, at *7 (S.D.N.Y. Mar. 29, 2016) (holding that "treatment of a

prisoner's medical condition generally defeats a claim of deliberate indifference"); *Pabon v. Wright*, 2004 WL 628784, at *7 (S.D.N.Y. Mar. 29, 2004) (dismissing deliberate indifference claim because "[i]t is undisputed that [the] defendants examined [the] plaintiffs numerous times over several years, administered diagnostic tests, and prescribed medications to treat plaintiffs' [illness]"), *aff'd*, 459 F.3d 241 (2d Cir. 2006); *Perez v. Hawk*, 302 F. Supp. 2d 9, 21 (E.D.N.Y. 2004) (dismissing a claim of inadequate medical care given that plaintiff received frequent medical attention while incarcerated).

That same conclusion is not true for Plaintiff's allegations against Dr. Morley. The SAC specifically alleges that, notwithstanding Dr. Prepetit's recommendation that Plaintiff see a urologist on June 8, 2020, Dr. Morley denied this request. (SAC at 8–9.) Although the SAC's timeline is unclear, Plaintiff further alleges that Dr. Morley did not permit her to visit a urologist until approximately seven months after Dr. Prepetit's initial recommendation. (*Id*. at 10.) Instead of addressing this argument, Defendants argue only that Plaintiff ultimately received her requested treatment. (Defs.' Mem. at 2.) However, the alleged denial of requested treatment plausibly demonstrates Dr. Morley's personal involvement in the alleged misconduct. *See Washington v. Morley*, 2024 WL 4252596, at *4 (S.D.N.Y. Sept. 20, 2024) (denying Dr. Morley's motion to dismiss where he allegedly "ignored and outright denied [P]laintiff's request for medical care"); *Allen v. Koenigsmann*, 2022 WL 1597424, at *10 (S.D.N.Y. May 19, 2022) (holding "[p]laintiffs have adequately alleged Morley's personal involvement" based on allegations that he received and dismissed letters advocating for certain medical treatments); *Taveras v. Semple*, 2023 WL 112848, at *12 (D. Conn. Jan. 5, 2023) (noting the court's previous holding that the plaintiff adequately alleged personal involvement where prison medical professionals allegedly failed to provide treatment during the relevant period); *Bushey v. Morley*, 2021 WL 4134794, at *3 (N.D.N.Y. Sept.

23

10, 2021) (holding Morley personally involved based on allegations that he "repeatedly denied [the plaintiff's] requests for testosterone treatment"). Plaintiff likewise alleges that Dr. Morley denied Dr. Janice's October 2, 2020 recommendation that Plaintiff undergo urodynamic testing, which similarly demonstrates Dr. Morley's alleged personal involvement for the purpose of Plaintiff's § 1983 claims. (SAC at 12.)

In sum, while Plaintiff plausibly alleges Dr. Morley's personal involvement in the alleged denial of medical care, the SAC fails to plausibly allege the personal involvement of Defendants Commissioner Loughren, Superintendent Russell, Dr. Mieszerski, Dr. Prepetit, and Deputy Superintendent McCarthy, and the claims against those Defendants are dismissed.

## II.    Eighth Amendment Claims

With the threshold issues resolved, Plaintiff's only remaining claims are against Defendants Drs. Small, McGurty, and Morley in their individual capacities. Defendants argue that Plaintiff fails to plausibly allege that either Defendant acted with deliberate indifference toward her serious medical needs and further contend that they are entitled to qualified immunity. (Defs.' Mem. at 5–9.) In turn, Plaintiff argues that Drs. Small, McGurty, and Morley knowingly denied and delayed medically necessary treatment despite being aware of her chronic pain and worsening medical condition. (Pl. Opp. at 4–5) The Court addresses each argument in turn.

At its core, Plaintiff's claims against the remaining Defendants are premised on an alleged deprivation of medical care in violation of the Eighth Amendment. To plead a civil rights violation pursuant to § 1983 for inadequate medical care, a prisoner must allege "deliberate indifference to [her] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Harrison*, 219 F.3d at 136. For liability to attach under this standard, a plaintiff must demonstrate that a healthcare provider acted or failed to act with reckless disregard for the plaintiff's health or safety. *Harrison*

24

*v. City of New York*, 2017 WL 4162340, at *4 (S.D.N.Y. Sept. 19, 2017) (citing *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)). As briefly discussed above, in order "[t]o succeed in showing deliberate indifference, [a plaintiff] must show that the acts of defendants involved more than lack of due care, but rather involved obduracy and wantonness in placing his health in danger." *LaBounty v. Coughlin*, 137 F.3d 68, 72–73 (2d Cir. 1988). "Yet not every lapse in medical care is a constitutional wrong. Rather, a prison official violates the Eighth Amendment only when two requirements"—one objective and one subjective—"are met." *Salahuddin*, 467 F.3d at 279.

The objective element requires that "the alleged deprivation of adequate medical care . . . be sufficiently serious." *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013). Under this element, the Court must ask (1) "whether the prisoner was actually deprived of adequate medical care" and (2) if so, "whether the inadequacy in medical care is sufficiently serious." *Latouche v. Hammer*, 2023 WL 4867795, at *2 (S.D.N.Y. July 31, 2023). Only "deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). Because a "prison official's duty is only to provide reasonable care," *Salahuddin*, 467 F.3d at 279 (citing *Farmer*, 511 U.S. at 844–47), "prison officials are liable only if they fail to take reasonable measures in response to a medical condition." *Rutherford v. Correct Care Sols.*, LLC, 2020 WL 550701, at *5 (S.D.N.Y. Feb. 4, 2020).

The subjective component requires a plaintiff to plausibly allege that the official acted with deliberate indifference to the inmate's health. *See Latouche*, 2023 WL 4867795, at *2. "This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id*. This means that defendants must "appreciate the risk to which a prisoner was subjected," and have a "subjective awareness of the harmfulness

25

associated with those conditions." *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017). A defendant's awareness of the risk of serious harm can be established through "inference from circumstantial evidence," including "from the very fact that the risk was obvious." *Jamie v. DOCCS*, 2026 WL 851352, at *5 (S.D.N.Y. Mar. 26, 2026) (citing *Farmer*, 511 U.S. at 842); *see also Upson v. Wilson*, 2025 WL 547455, at *2 (2d Cir. Feb. 19, 2025) (summary order) ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and . . .the very fact that the risk was obvious.").

Taken as true, liberally construed, and interpreted to raise the strongest possible arguments, the SAC fails to state a cognizable Eighth Amendment claim. Beginning with Dr. Small, Plaintiff alleges that she waited approximately four weeks after submitting a sick call slip and writing to Dr. Small before being seen on June 24, 2021. (SAC at 13.) Plaintiff further alleges that, during this appointment, Dr. Small declined to prescribe pain medication and denied Plaintiff's request for an MRI. (*Id.*) However, even accepting these allegations as true, the SAC simultaneously demonstrates that Plaintiff was already receiving ongoing medical treatment during the relevant period. For instance, Plaintiff alleges that she wrote to Dr. Small on May 21, 2021, seeking to see a specialist for the fibroid in her uterus. (SAC at 13.) Plaintiff likewise alleges that, on that very date, she received the urodynamic testing recommended by Dr. Janice. (*Id*. at 12–13.) Plaintiff further concedes that throughout all relevant times of this action, she has been prescribed multiple antibiotics, probiotics, and vitamins—including by Dr. Small—in an attempt to treat her recurring UTIs. (*Id*. at 14.) As explained above, "treatment of a prisoner's medical condition generally defeats a claim of deliberate indifference." *See Melvin*, 2016 WL 1254394, at *7; *see also Griffin*,

2021 WL 1226428, at *7 (same); *Perkins*, 2019 WL 1244495, at *11 (same); *Pabon*, 2004 WL 628784, at *7 (same).

While Plaintiff may disagree with Dr. Small's approach to treatment, the Court reiterates that "[d]isagreements over medications, diagnostic techniques . . ., forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001); *see also Rodriguez v. Westchester Cnty.*, 2024 WL 4390222, at *2 (S.D.N.Y. Oct. 3, 2024) ("Plaintiff's own complaint indicates that he received treatment—the issue was that Plaintiff just disagreed as to the treatment received and the location where treatment was administered . . . [which] does not constitute deliberate indifference and/or negligent medical treatment."); *Bernel v. Korobkova*, 2023 WL 6146600, at *7 (S.D.N.Y. Sept. 19, 2023) ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim."); *Veloz v. New York*, 339 F. Supp. 2d 505, 525 (S.D.N.Y. 2004) ("The Eighth Amendment is not implicated by prisoners' complaints over the adequacy of the care they received when those claims amount to a disagreement over the appropriateness of a particular prescription plan."), *aff'd*, 178 F. App'x 39 (2d Cir. 2006).

Plaintiff similarly fails to satisfy the subjective prong of the relevant standard against Dr. Small. The SAC is devoid of any allegations that Dr. Small knew of and intentionally disregarded Plaintiff's medical needs. To the contrary, and as discussed above, the SAC reflects that Dr. Small provided Plaintiff with repeated evaluations, appointments, and medication. To the extent Plaintiff alleges that Dr. Small misdiagnosed her, or provided the incorrect mediation, those claims similarly fail because "[a]llegations of . . . misdiagnosis . . . [do not] state a cause of action under the Eighth Amendment." *Harris v. Westchester Cnty. Med. Ctr.*, 2011 WL 2637429, at *3 (S.D.N.Y. July 6,

2011). Indeed, "[m]edical malpractice does not rise to the level of a constitutional violation unless the malpractice involves culpable recklessness—'an act or a failure to act by [a] prison doctor that evinces a conscious disregard of a substantial risk of serious harm.'" *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011) (quoting *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998)); *see also Estelle*, 429 U.S. at 105–06 (noting that an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind"); *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (observing that "negligent malpractice do[es] not state a claim of deliberate indifference"); *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003) ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."). Plaintiff cannot complain that the State Defendants were "negligent in diagnosing or treating a medical condition [because that] does not state a valid claim of medical mistreatment under the Eighth Amendment." *Bright v. Annucci*, 2024 WL 3012043, at *7 (S.D.N.Y. June 13, 2024) (quoting *Estelle*, 429 U.S. at 106). Plaintiff therefore fails to plausibly allege that Dr. Small acted with deliberate indifference toward her serious medical needs, and Plaintiff's Eighth Amendment claims against Dr. Small are dismissed.

The analysis is somewhat closer with respect to Drs. McGurty and Morley. Plaintiff alleges that both defendants denied her request to see a urologist for approximately seven months. (SAC at 9–10.) Plaintiff claims that Dr. Morley denied the first request due to "arbitrary procedures and misadministration," while Dr. McGurty denied the second request due to COVID-19. (*Id.* at 9.) Generally, "[w]hen the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged delay or interruption in treatment rather than the prisoner's underlying medical

28

condition alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious, to support an Eighth Amendment claim." *Smith*, 316 F.3d at 185 (cleaned up). Here, Plaintiff was first recommended to be seen by a urologist on June 8, 2020, which coincided with the onset of the COVID-19 pandemic. (SAC at 9.) Plaintiff herself acknowledges that the requests were denied for administrative reasons stemming from the COVID-19 pandemic. (*Id.*) While a delay in treatment can equate to deliberate indifference, district courts during the COVID-19 pandemic recognized that correctional facilities faced extraordinary operational and medical constraints affecting scheduling, referrals, and treatment decisions. *See, e.g., Carter v. Akinyombo*, 2022 WL 2307679, at *7 (S.D.N.Y. June 27, 2022) (dismissing Eighth Amendment claim where "the delay" in plaintiff's surgery was "caused by the COVID-19 pandemic"); *Fenton v. Provow*, 2022 WL 3904110, at *4 (N.D.N.Y. Aug. 5, 2022) (recognizing that the "difficulty in scheduling appointments with specialists was a result of the ongoing COVID-19 pandemic and therefore outside of [the correctional facility's] control"), *report and recommendation adopted*, 2022 WL 3908799 (N.D.N.Y. Aug. 30, 2022); *Raynor v. Feder*, 2023 WL 6295647, at *7 (D. Conn. Sept. 27, 2023) ("[T]o the extent that the delays in treatment Plaintiff experienced were pandemic-related, he . . . fails to demonstrate deliberate indifference"). The same is true of Plaintiff's allegation that Dr. Morley denied her access to offsite urodynamic testing in October 2020, which was likewise during the height of the COVID-19 pandemic. (SAC at 12.)

Plaintiff's additional allegations that Dr. McGurty failed to prescribe both Turmeric and BioPerine, as recommended by non-defendant Dr. Moorjani-Harish, likewise fail to establish deliberate indifference. Plaintiff specifically alleges that Dr. McGurty prescribed only Turmeric because he believed "it had both medications in one pill," which Plaintiff contends was inaccurate. (SAC at 22.) Even accepting this allegation as true, disagreements over medications or forms of

treatment are not adequate grounds for § 1983 claims. *See Sonds*, 151 F. Supp. 2d at 312; *Rodriguez*, 2024 WL 4390222, at \*2. At most, Plaintiff's allegations can be construed as asserting medical malpractice, which similarly does not rise to the level of a constitutional violation. *See Hill*, 657 F.3d at 123. Moreover, as described above, the SAC simultaneously demonstrates that Plaintiff continued receiving extensive medical treatment throughout the relevant period, including antibiotics, probiotics, vitamins, diagnostic testing, and consultations with multiple medical providers. (SAC at 8–18.) Under these circumstances, Plaintiff fails to plausibly allege that Drs. McGurty and Morley acted with deliberate indifference to her serious medical needs, and the claims against them therefore must be dismissed.[5]

## III.    Leave to Amend

Finally, the Court must determine whether Plaintiff should be granted leave to amend her pleadings. The Second Circuit has instructed that "a *pro se* plaintiff who is proceeding *in forma pauperis* should be afforded the same opportunity as a *pro se* fee-paid plaintiff to amend [her] complaint prior to its dismissal for failure to state a claim, unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim." *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999) (per curiam); *see also Owens v. N.Y.C. Dep't of Sanitation*, 2013 WL 150245, at \*3 (S.D.N.Y. Jan. 15, 2013) ("[A] court should grant leave to amend [to a *pro se* litigant] at least once before dismissing [a complaint] with prejudice"); *Breer v. Maranville*, 2012 WL 6597707, at \*3 (D. Vt. Nov. 27, 2012) ("The Second Circuit has cautioned that district courts should not dismiss *pro se* complaints with prejudice

---

[5] Defendants additionally argue that they are entitled to qualified immunity. (Defs.' Mem. at 8.) However, because the Court dismisses all claims against Defendants on other grounds, the Court need not address whether Defendants are independently entitled to qualified immunity.

without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated.").

Although this Court has already afforded Plaintiff an opportunity to amend, the Court cannot conclude at this stage that amendment would necessarily be futile. Construing Plaintiff's allegations liberally, and mindful of Plaintiff's *pro se* status, the Court will permit Plaintiff one final opportunity to replead any claims dismissed without prejudice in this Opinion & Order. Plaintiff is advised that any Third Amended Complaint will completely replace, not supplement, the Second Amended Complaint. Any claims, facts, or attachments that Plaintiff wishes the Court to consider must be included in or attached to the Third Amended Complaint. Plaintiff is further advised to ensure that any Third Amended Complaint is organized chronologically and does not contain repetitive allegations.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss the Second Amended Complaint is GRANTED. All claims against Defendants Thomas J. Loughren, Eileen Russell, Aileen McCarthy, Dr. Patrick Prepetit, Dr. Laura Mieszerski, Dr. Michelle Small, Dr. John A. McGurty, and Dr. John Morley are dismissed without prejudice. Plaintiff's claims for injunctive relief are dismissed as moot, and Plaintiff's potential state law claims are dismissed without prejudice and may be refiled in the appropriate state court.

Because Plaintiff proceeds *pro se*, and in light of the Second Circuit's instruction that a *pro se* plaintiff should generally be afforded an opportunity to amend, Plaintiff is granted leave to file a Third Amended Complaint solely with respect to any claims that have not been dismissed with prejudice. If Plaintiff chooses to do so, Plaintiff shall file a Third Amended Complaint by June 30, 2026. Defendants are then directed to answer or otherwise respond by July 21, 2026. If Plaintiff

fails to file a Third Amended Complaint within the time allowed, and cannot show good cause to excuse such failure, the claims dismissed without prejudice by this Opinion & Order will be deemed dismissed with prejudice, and the Clerk of Court will be directed to close this case.

The Court respectfully directs the Clerk of Court to (1) terminate the Motion at ECF No. 78; and (2) mail a copy of this Opinion & Order to *pro se* Plaintiff at the address listed on ECF and to show service on the docket.

SO ORDERED.

Dated: May 14, 2026
      White Plains, NY

_____
Nelson S. Román, U.S.D.J.

32